This is a review from the District Court's Motion for Summary Judgment with respect to the issue on overtime and is entitled to a de novo review. It is not disputed that Mr. Watkins worked for Ameripride for in excess of 40 hours per week. The complaint sought state overtime remedies, not fair labor standards remedies under the federal law. Ameripride's Motion for Summary Judgment asserted that state overtime remedies were not available because of the motor carrier exemption to the Fair Labor Standards Act. The Fair Labor Standards Act itself and the courts that have reviewed the matter have concluded that the Fair Labor Standards Act was not intended to preempt state and local overtime remedies that were extended by those jurisdictions. Rather, the FLSA and the cases indicated those remedies would continue to be available. Mr. Irwin, the district judge thought the Klitschke case controlled here, right? The Klitschke case, yes it did, and that was the basis for its decision. The Klitschke case was decided under the Fair Labor Standards Act and not under the state overtime laws. It was not a preemption case. But what about the reasoning of Klitschke? The reasoning of Klitschke was one of saying that because of the interstate character of the transportation, it was interstate in character. However, again, that is decided under the cases interpreting it, which indicate that it does not preempt state and local overtime laws. Again, with respect to the specific Klitschke case, the facts here are different. The key thing is the shipper's intent. The shipper's intent at the outset was that the to its warehouse for later distribution. There were a few single uniforms that were purchased direct with the idea they would be delivered to the shipper with the intent of the shipper that they'd be delivered. These were extraordinary cases where they were not kept in stock by people who were either too very large in either fat or too tall. That kind of thing. And so they were not kept in stock. But this amounted to the sales aspect of the job was about three percent of the total amount of his work. And the amount of uniforms and the like that were sent ship direct were a tiny percentage of that. So I would distinguish those facts in a Klitschke case. But the primary thrust of it, I believe, is that it was not decided as an overtime state overtime preemption kind of case. Can you help me with the language? What's the language of the test that we should apply to determine whether or not state law controls here? Well, let's state it. You look to the Fair Labor Standards Act in those cases that I've cited in my opening brief. And in those cases, they simply state that the it was the intent of the Fair Labor Standards Act to provide additional remedies, not to displace overtime provisions that existed in state and local proceedings. That would be the language I would go to. If you're referring to the Klitschke case, I'm just simply saying it was decided on the Fair Labor Standards Act. And this case was brought under the state overtime laws. I'm not sure I follow the difference. Why is that? If you bring one under one, but the other ones. The question is whether the Fair Labor Standard Act preempts why it is not Klitschke. Klitschke may be different on the facts that you just indicated, but why is the test different from the Klitschke test? Well, again, I think the facts are very similar. There's no doubt about it. I make the distinctions that there are there. And we've urged those at the trial level and here in the briefs. The distinction I make here, though, is that the Klitschke case itself was brought into the Fair Labor Standards Act. Yes. This case was brought under the state act and the state. And in order to have excuse me. I'm sorry. Go ahead. In order to have the state law of overtime not apply, we have to find some intent of the federal legislation of the Fair Labor Standards Act and the cases that follow to preempt it. That's the thrust of this case. And it is my reading of the cases and the Fair Labor Standards Act that it doesn't it provides just to the contrary. So but to make sure I understand the legal framework in which we're operating, to the extent that the behavior of Mr. Watkins and his employer with respect to the job he was doing are controlled by the Fair Labor Standards Act. He is the state remedy is preempted. Is that right? No, no. It's just exactly what is not. I'm saying that the act specifically says this is an additional remedy. I see. OK. It's not a preemptive remedy. In other words, you're not having two laws overlap each other. And they're saying, well, the federal law has to apply. These are that group of cases in which they're saying here are the laws. Here are the rules that will apply to federal overtime. But in addition to that, you can still have the additional remedies that state and local governments provided. But there's an exclusion in the California Act for matters that are regulated by the secretary of transportation. Is that right? Right. There is language there. And that's the second concern. This was this was not raised in the party because we were focused on the Klitschko case and arguing that. In our arguments in the motion, this case deals with that same authority to regulate by the secretary of transportation, doesn't it? It does. But it isn't an indication that the that Ameripride was a carrier. But rather, in that case, they're saying is subject to regulation of the Department of Transportation. In the state administrative rule, it says is subject to regulation. There is a difference. There is a difference as to whether the Department of Transportation is acted with respect to this particular company. Now, is it permitted permitted for a state to do wage and hour regulation in an area that is subject to the authority of the secretary of transportation to regulate? I believe that according to the Fair Labor Standards Act, the answer is yes, they are permitted to do it. The question that is peculiar to this is they've gone another step is the regulatory agency has come up and said, well, we're going to where we think the Department of Transportation has acted, which is different from under the Fair Labor Standards Act under the Fair Labor Standards Act. It's a broader preemption. If you were to have a preemption with respect to cases filed in the Fair Labor Standards Act. In other words, in that situation, you have a situation where if it's even subject to regulation, the Fair Labor Standards Act would take it out. Now, under this particular state regulation, it doesn't say subject to it says specifically not subject to regulation, but is regulated. There's a distinction there. I don't think that that's a distinction that is the controlling factor. I just simply think that it's basically we have a situation where the language does not require. You to bring these facts under its jurisdiction, the language cited by the Superior Court. Employees whose hours or service are regulated by the U.S. Department of Transportation's language. Got about a minute left. Did you want to reserve that or do you want to use it up now? I'll reserve it. Thank you. Good morning. Good morning. My name is Craig Wu. I represent the appellee merit pride services. As to the appellant's contentions that the Motor Carrier Act does not apply, I think those are erroneous. The California wage orders specifically provide that the state of California is deferring to the federal statute, and that's contained specifically in the California wage order that applies to Mr. Watkins, and that was cited in our brief. The particular provision that was discussed in Klitschke also addressed the issue of whether the secretary of the Department of Transportation had actually exercised authority. And the court specifically held there that the secretary does not need to exercise that authority. It's really within the secretary's discretion whether the secretary wants to govern those particular positions and whether the employer complied with Department of Transportation regulations is really of no significance. But counsel, how is your analysis affected by the fact that the California code says whose hours of service are regulated by the Department of Transportation as opposed to the warden in Klitschke, which has the authority to regulate? Well, I believe the language that is specifically contained in the wage order refers to a particular statute. Right. And what it says is that the particular employee is regulated by that particular statute. Right. It doesn't discuss whether that particular employee is actually whether the secretary of transportation has specifically decided to regulate that employee. What do you make of the wording whose hours of service are regulated by? What does that mean? That that employee is subject to those particular statutes. If it meant is subject to, why wasn't the same wording used as was used in the Klitschke case where it said has the authority to regulate? Well, I believe Klitschke was specifically addressing that statute. Not the California statute, but it was addressing the federal statute. And the particular wording of the state statute. My question is, was that language used advisedly by the California administrator in saying are regulated as opposed to has the authority to regulate? Do you think that that distinction was made for a reason? I don't think there is a distinction. I think what is happening there is that the California agency is deferring its authority to the federal government to regulate. Were the hours of service in this case actually regulated by the Department of Transportation in this particular employee? They were not. They were not regulated. So whether the Secretary of the Secretary of Transportation decides to exercise its authority is really no significance. It's the focus should be on whether the employee is subject to those particular regulations. And that the particular employee is engaging in interstate commerce. And I think that's what we have here. Well, let me assume for the moment that we agree with you that the question is not whether there is regulation, but whether there is the authority to regulate. Assuming that for the purpose of this question. I don't think the test is whether or not there is authority in the federal government under the Commerce Clause to regulate. I think the question is whether or not there is authority under a statute to regulate. Isn't that right? No, I think the test is whether the employee is engaging in interstate commerce. Where are you getting that from? Are you getting that from Klitschke? From Klitschke, yes. Do you have Klitschke in front of you? I do not have that in front of me. Well, Klitschke says the statute is 49 U.S.C. 10521 with a bunch of parents after that. That statute interpreted by Walling v. American Stores, 3rd Circuit 1943, a longstanding case. And then by the United States Supreme Court in Walling v. Jacksonville paper. It's really not a question of interstate commerce within the power of the federal government to regulate. But I'm now just quoting from the Supreme Court in Walling. Jurisdiction extends to transportation within a state that is, quote, a practical continuity of movement from the manufacturers to suppliers without the state through a warehouse and on to customers whose prior orders or contracts are being filled. That is to say, we're talking about interstate transportation and a more or less continuous interstate transportation to come within the statute and to come within the Supreme Court's construction of that statute. Well, I believe that does still implicate interstate commerce. Well, of course it implicates interstate commerce. But I think that's the test. That's the test that Klitschke applied. That's the test. That's the language that comes out of the Supreme Court construing that statute. Don't you agree that that's the test? That is the test. However, that also implicates interstate commerce. Well, I understand it implicates interstate commerce. But I prefer it simply to apply the test. Why is this, in the words of the United States Supreme Court, a practical continuity of movement from the manufacturers or suppliers without the state through a warehouse and on to customers whose prior orders or contracts are being filled? I gather that 3% of this man's work was selling new goods. And of that 3%, only a tiny percentage, and the percentage we don't know except we know that it was very tiny, is actual orders sent for people who have odd sizes. I believe he did testify in his deposition that it was about 3%, and that also was the court's finding. What was 3%? 3% was sale of new uniforms. That's correct. Now, that 3%, largely, as I understand the testimony and the allegation and the complaint and the declaration, that 3% was largely, almost overwhelmingly, uniforms previously bought by his employer, held in stock by the employer, and then when the customer says, I want something, they take it off the shelf where it has been ordered generically and then sold to them. It's not a special order by the customer. Only the tiny percentage are the special orders by the customers. Isn't that right? Well, I wouldn't characterize it as a tiny percentage. What percentage is it? That we don't know. It is a percentage of 3%. Probably so. More than probably. Certainly so. However, Your Honor, the Tenth Circuit has specifically said that it doesn't really matter that the goods that are shipped from out of state sit in a warehouse. The fact that they are coming from out of state with the ultimate purpose of being transported. Well, I would agree that the question is, do they sit in a warehouse? But what I'm interested in, and I'm trying to understand Klitschke, and I'm trying to understand Walling, is when they're sitting in the warehouse, do they, when they arrive, and then when they sit there, do they have a customer's name on them? And I gather in this case, they don't. When the customer orders, they fill out of existing stock, but only when the customer orders and they go to the shelf and pull the uniform off the shelf that's previously been ordered,  Only then does the customer's name get attached. Well, they don't order new uniforms unless a customer needs one. So they're not going to pay for a uniform just for the purpose of having it sit in stock. Does it matter whether their names are on it or not, or does it matter that it came from elsewhere? I mean, what counts? I think it does. It does matter, and I think that's what we have here, is that you have a customer who's ordered a new uniform. The company doesn't order those uniforms until it's needed. It doesn't keep new stock in the warehouse. Primarily, the business is dealing with used uniforms, but the percentage that we're speaking about here is the percentage of new uniforms that are being shipped from out of state. And the company doesn't order those until a customer within California has a need for one. There's no purpose in buying a new uniform unless there's a need for it. The old uniforms at one time started out as new uniforms, right? That's correct. And they came from elsewhere. That's correct. Does it matter that they've somehow come to rest in California? It does, to the extent that that would be in the flow of interstate commerce. Let me read to you from... This is Mr. Watkins' declaration. I'm on page 3 of that declaration. He says, All uniforms arrive without specific identification by customer. Should a customer want special identification, he would order it by general description, order what identification should appear on the uniform. The uniform or other material would be taken from inventory. The identification work would be done in the warehouse by a person specially designated to do that work. When I needed new uniforms, I would obtain them from the warehouse. In eight and a half years of employment, I did not see any orders where customers bought specific materials from Cleveland, Tennessee with delivery merely trans-shipped at the plant or warehouse. The orders were simply filled from fungible goods that were stored in the cage in the plant in uniforms from the warehouse. That strikes me as we're not trans-shipping. These are not through shipments. They're sitting in the warehouse for a time. Well, again, the issue there is you're dealing... You're focused on whether these are fungible goods or not. And I don't think that's... That's only part of it, but yes. I don't think that's significant. I think the... As I said, the Tenth Circuit and I believe that Klitschke recognized this principle that even if a good is fungible and is being shipped from out of state, that in itself is sufficient. Counsel, what language are you relying upon in Klitschke for that premise? What specific language? Well, I believe they cited a Tenth Circuit case and I'll give you that case. Well, why don't you tell me from Klitschke what language you're referring to before you give me the Tenth Circuit cite? I believe this was a case dealing with Coca-Cola and I apologize. I'm trying to find the cite. I was trying to find the language from Klitschke that you're relying upon because I thought that in Klitschke    specified a final place of delivery within Oregon other than the Steiner Warehouse and that's why I was curious as to why they didn't specify a final place as to what language you're relying upon that said it didn't matter if it's in a warehouse. Well, I believe they cited with approval the Tenth Circuit case that I'm thinking of that deals with fungible goods. Okay, what page was that on and where's the citation in Klitschke? Apologize, I don't have that citation. The case that I'm thinking of that was cited I believe that was cited within Klitschke is Thomas v. Wichita     thank you. Thank you very much Mr. Williams. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, Your Honor. The Wichita case that your referred to the court specifically found that the returns in every case were in interstate commerce. But isn't that the point Counsel that the opposing counsel is trying to make? That the fact that the goods were in a warehouse did not exclude them from interstate transportation. No, in every case there, not I shouldn't say in every case, there must, there may be a few direct shipments, but the normal transportation habits of the country are that things would go to a warehouse for and break bulk and be distributed. That's why the question Counsel, isn't the difference whether or not they're transported intrastate as opposed to interstate, isn't that the difference that we're looking at? That is correct. And in this case, weren't the goods, didn't they originate interstate, outside the state of California? Well, we're talking here   over 97 percent of the work did not involve the sale of product. Of the sale of product, 3 percent of the goods did not involve the sale of goods. So, only a tiny percent were extraordinary uniforms, either because of the height or weight of the individual required special shipping. Did it matter if it's sale of product or renting the uniforms? Does that matter? Well, if it was a rental, it would have been identified as a through shipment from the get-go. The shipper would have, he would have bought the product, he was renting a product that was being shipped. But if he bought them all in bulk just to have them there in the event that his customers needed them and they were bought from a place outside California, would that be interstate transportation? I think the thrust of the cases is, if they were, came to rest permanently and they were not addressed to a specific shipper, that would be a break in the transportation. It would not be storage and transit to, to use the language of transportation. What case authority are you relying upon to support that argument? I didn't quite catch the question. What case authority are you relying upon to support that argument? I don't have the cases in front of me, but I think that the cases are, are clearly laid out in the, in the briefing, Your Honor. I just don't, I can't call it up like that. All right, thank you. Thank you, gentlemen. The case just
judges: Silverman, W. Fletcher, Rawlinson